SAPERY v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. January 11, 1905.)

CUSTOMS DUTIES—CLASSIFICATION—TYPE METAL—BROKEN STEREOTYPE PLATES —OLD TYPES.

> The provision for "types, old," in Tariff Act July 24, 1897, c. 11, § 2, Free List, par. 690, 30 Stat. 194 [U. S. Comp. St. 1901, p. 1689], does not include an alloy, containing approximately 85 per cent. of lead, 12 per cent. of antimony, and 3 per cent. of tin and copper, made from the dross of type metal refined and melted with 15 to 20 per cent. of old movable types, and cast in the form of stereotype plates, which were never used as such, but broken into pieces and packed in barrels for importation. Such material is dutiable as "type metal," under paragraph 190 of said act (chapter 11, § 1, Schedule C, 30 Stat. 151 [U. S. Comp. St. 1901, p. 1645]).

In Error to the District Court of the United States for the Eastern District of Michigan.

These proceedings were brought by Henry Sapery, survivor of himself and Sarah Sapery, deceased, copartners as the Syracuse Smelting Works, claimant of certain merchandise seized for violation of the customs laws.

Bernard B. Selling, for plaintiff in error.
Wm. D. Gordon, for the United States.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

RICHARDS, Circuit Judge. This was an action, in the form of a libel, brought under section 9 of the customs administrative act of June 10, 1890 (26 Stat. 131), to forfeit 35,618 pounds of type metal, packed in 30 barrels, which was shipped into the United States at Detroit from Montreal, Canada, and, as charged by the government, was fraudulently invoiced and entered as "types, old, and fit only to be remanufactured," free of duty, under paragraph 690 of the act of July 24, 1897, c. 11, § 2, Free List, 30 Stat. 194 [U. S. Comp. St. 1901, p. 1689], when, in point of fact, it should have been invoiced as "type metal," dutiable at "one and one-half cents per pound for the lead contained therein," under paragraph 190 of the same act (chapter 11, § 1, Schedule C, 30 Stat. 151 [U. S. Comp. St. 1901, p. 1645]). An answer was filed by Henry Sapery, surviving partner of a firm doing business as the Syracuse Smelting Works, which shipped these goods from Montreal, consigned to itself at Chicago, as claimant, in which, not expressly denying that the goods thus imported consisted of type metal, he averred that they were invoiced as "old types" by an employé, Lalonde, who was but 17 years of age, of little experience in business, and not familiar

with the classification of metals, and that there had been no intent
on the part of the shipper or any of its agents to defraud the
government in thus invoicing and entering the goods.

The case was tried before a jury. At the close of the evidence
the court instructed the jury that the imported material was not
"old types," nor entitled to entry free as such, but "type metal,"
subject to duty as such at 1½ cents per pound for the lead contained
therein, and left it to the jury to say whether it was fraudulently
invoiced and entered as "old types" to escape duty. The jury found
it was, and returned a verdict for the government. There are many
assignments of error, but the real question is whether the court
erred in instructing the jury that the material imported was "type
metal," and not "old types."

The material imported was in the form of stereotype plates,
broken in pieces and packed in barrels for shipment. The analysis
made by the government chemist showed it contained 85.59 per
cent. of lead, 11.59 per cent. of antimony, ½ per cent. of copper,
and 2.32 per cent. of tin. That made by the chemist for the claim-
ant showed that it contained 84.39 per cent. of lead, 11.66 per
cent. of antimony, 1.55 per cent. of tin, and 1.97 per cent. of copper.
In other words, speaking approximately, these analyses showed the
alloy contained 85 per cent. of lead, 12 per cent. of antimony, and
3 per cent. of tin and copper. The witnesses for the government
testified that such alloy constituted type metal. While some of
the witnesses for the claimant conceded that the component parts
of the material were those of type metal, they stated that, in their
opinion, it could not be satisfactorily used to make stereotype plates,
and therefore they would not purchase it as type metal, nor deem
it such. Some based their opinion on the appearance of the ma-
terial, saying it looked "dead," and needed an addition of new metal
to give it "life." Others thought the proportions of lead, antimony,
and tin were not the best—not such as they used—but they de-
clined to give their own formula on the ground it was a trade secret.
The witnesses for the claimant who thus testified were practical
men, in charge of the work of making stereotype plates for the dif-
ferent newspapers of Detroit. They all admitted that type metal
melted and cast into stereotype plates would, because of the use thus
made of it, soon become what they called "dead," and would need,
upon being remelted, to have added to it new metal in order to give
it "life." During the course of the trial a stereotyper for a news-
paper in Detroit used the material to cast a half-tone plate, and tes-
tified it worked all right for that plate. He regarded it as "poor
stereotype metal."

The claimant was in court during the entire trial, but was not
sworn as a witness. It was in evidence, however, uncontradicted,
that upon the trial of a similar suit at Auburn, N. Y., to forfeit a
like importation, the claimant was sworn, and testified that the
imported material was type metal, and that he did not authorize
anybody to ship it as "old types." The claimant's testimony tended
to show that the Syracuse Smelting Works had a small factory in
Montreal; that it purchased from newspaper foundries and junk

dealers throughout Canada the dross of type metal. This was put through a furnace, to refine it, and run into pigs. Then these pigs, with 15 or 20 per cent. of old movable types, were melted together in an ordinary kettle and cast into stereotype plates; a casting box and old matrices being purchased from the newspaper companies of Montreal. The stereotype plates thus produced were broken in pieces, packed in barrels, and shipped as "old types" to the United States.

It is conceded that type metal is an alloy made of lead, antimony, and tin, with sometimes a trace of copper. The principal ingredient is lead. Under our tariff laws, for many years type metal has been dutiable according to the lead contained in it, but at a lower rate than lead itself. This distinction is maintained in the Dingley act of July 24, 1897. Under it, lead dross, lead bullion, or base bullion, lead in pigs and bars, etc., old refuse lead run into blocks and bars, and old scrap lead, fit only to be remanufactured, is dutiable at 2⅛ cents per pound (paragraph 182, c. 11, § 1, Schedule C, 30 Stat. 151 [U. S. Comp. St. 1901, p. 1644]), while type metal is dutiable at 1½ cents per pound for the lead contained therein (paragraph 190, 30 Stat. 151 [U. S. Comp. St. 1901, p. 1645]). It necessarily long ago became a question before the Treasury Department as to what percentage of antimony should be required to permit an alloy containing lead as the chief ingredient to be invoiced and entered as type metal instead of pig lead; and on March 31, 1887, the Secretary of the Treasury, in a carefully considered decision, held that an alloy containing 90.25 per cent. of lead, 9 per cent. of antimony, and .71 per cent. of tin and copper, should be classified as type metal, instead of pig lead; this percentage of antimony being regarded as sufficient to render the material unfit for the ordinary purposes to which pig lead is applied. In his decision the Secretary called attention to the fact that the composition under consideration was only suitable for use as a low grade of type metal; that there was no well-defined standard of type metal, the lead, antimony, and tin being mixed by different manufacturers in different proportions, the proportion used by each being guarded as a trade secret. Thus certain grades of type metal contained as high as 25 per cent. of antimony, while others contained only 14 per cent., and stereotype metal and electrotype metal contained only 13 per cent. and 5 per cent., respectively. (T. D. 8,147, March 31, 1887.) This ruling of the department was adhered to in the decision of January 31, 1890 (T. D. 9,831), in which it was held that an alloy containing 88.19 per cent. of lead, 4.01 per cent. of antimony, and .629 per cent. of tin (over 7 per cent. being left unaccounted for), should be classified as pig lead, and not type metal; the Secretary saying that it was not considered expedient at that time to admit as type metal any composition containing a lower percentage of antimony than 9 per cent. It is to be observed that it is conceded in the present case that the material in question contains nearly 12 per cent. of antimony.

In preparing his decision of March 31, 1887, which fixed a standard of type metal for purposes of classification under the tariff laws, the Secretary had recourse to all the sources of information open

to the government, and the comments he makes on the reports submitted to him apply to the testimony in this case. It was impossible to obtain from the witnesses for the defense any definition of a standard type metal. Each had his own formula, which he guarded as a trade secret. Those who testified that the imported material was not type metal, based their opinion upon the looks of it. From its appearance, they thought it would not make good stereotype plate. Through much melting, it had become "dead," and would need new metal to give it "life." But this, they conceded, was true of all type metal after being used for a time.

The testimony of the claimant shows that the stereotype plates, broken in pieces and imported in barrels, had been made out of what was once type metal. Type dross refined and cast in pigs and old types (15 to 20 per cent.) were melted together and cast in plates. The old types were added in order to give the material "life," so that it might better be cast into plates. Obviously the old types, when melted, cease to be old types. They had passed through one of the processes of being remanufactured. They did not again become old types, nor did the type dross become old types when cast into stereotype plates and then broken in pieces for shipment. Old stereotype plates—even those which have been used as stereotype plates—do not become, when broken in pieces, old types. The act of July 24, 1897, makes stereotype and electrotype plates for printing dutiable at 25 per centum ad valorem (paragraph 166, 30 Stat. 151 [U. S. Comp. St. 1901, p. 1643]), and new types dutiable at 25 per centum ad valorem (paragraph 190), while "types, old, and fit only to be remanufactured," are on the free list (paragraph 690). The same distinction existed in prior tariff acts, and under the act of March 2, 1861 (12 Stat. 182, c. 68), and July 14, 1862 (12 Stat. 543, c. 163), it was held by the Treasury Department that "old stereotype plates broken in pieces" are dutiable under the special provisions for "type metal"; such plates not being in any proper sense "types," and not, therefore, entitled to free entry, as claimed, under the provision for "types, old, and fit only to be remanufactured." T. D. 1559.

The casting of the imported material into stereotype plates may be regarded as an admission that it was type metal intended for use in making stereotype plates. Indeed, the witnesses for the claimant testified it was run into plates in order to show that it could be so cast. Again, the shipment of these plates as "old types" was a further admission that the material of which they were composed was type metal. If, as held by the Treasury Department, old stereotype plates broken in pieces are not old types, but type metal, so was this material type metal.

The above facts being those relied on by the claimant, it became simply a question of law whether the imported material was dutiable under paragraph 190, as type metal, or free under paragraph 690, as old types. Cadwalader v. Jessup & Moore, 149 U. S. 350, 13 Sup. Ct. 875, 37 L. Ed. 764. The court correctly held that it was an inferior grade of type metal, dutiable under paragraph 190. The question whether the goods were invoiced as old types with intent to defraud was left to the jury. The charge on this

point was entirely fair to the claimant, and, since there was ample testimony to sustain the verdict, the judgment of the District Court must be affirmed.